## WIND ENERGY DEVELOPMENT AND OPTION AGREEMENT

This Wind Energy Development and Option Agreement (the "Agreement") is made and entered into effective as of the 17th day of November 2006 (the "Effective Date") by and between Renewable Land, LLC., a California limited liability company ("RLC"), Sean Garriff Roberts, Trustee of the Sean Garriff Roberts 2005 Trust dba Roberts Investments, a California trust ("Investments"), Renewable Management Corp., a California corporation ("RMC," together with RLC and Investments, collectively, the "Owners"), and Homestead Wind Farm LLC, a Delaware limited liability company, its successors and assigns ("Homestead"). Owners and Homestead are sometimes referred to herein individually as a "Party" and together as the "Parties".

### Recitals

A.     Homestead is interested in constructing wind energy facilities to provide clean, environmentally friendly, electrical energy.

B.     Homestead has identified a number of potentially suitable sites, including the RLC Property, the Investments Property and the BLM Property (collectively, the "Owners' Property"), in each case on which to build wind turbine generators on tubular towers, pad mounted transformers, substations, access roads, wind monitoring equipment, underground and overhead electrical transmission and communications lines, and other facilities (collectively, the "Wind Power Facilities") for the operation of a wind project (the "Project").

C.     Homestead desires to acquire the right and option to: (i) lease or purchase the RLC Property; (ii) lease the Investments Property; and (iii) with respect to the BLM Property, either (A) receive an assignment, sublease, sub-easement, or other conveyance of the RMC Rights, or (B) if during the Term any Owner acquires the BLM Property from the BLM, purchase or lease the BLM Property.

D.     The Owners desire to grant such option to Homestead, all on the terms set forth herein.

D.     Homestead is also interested in obtaining the rights to acquire additional parcels of land and/or real property rights in the area surrounding the Owners' Property for the benefit of the Project, as more particularly identified on the map and on the real property descriptions set forth on Exhibit B hereto (the "Homestead Property" and together with the Owners' Property, the "Project Property").

E.     The Parties desire to work together in the performance of certain development-related activities identified in this Agreement.

NOW THEREFORE, in consideration of these premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owners and Homestead do hereby agree as follows:

Section 1.   DEFINITIONS.

As used in this Agreement, the following terms shall have the meaning assigned to them below:

Additional Consideration Period: has the meaning given to it in Section 3(a)(3).

Agreement: has the meaning set forth in the opening paragraph of this Agreement.

Airport Approval: has the meaning given to it in Section 7(b).

Base Megawatt Capacity: has the meaning given to it in Section 3(a)(3).

Base Option Term: has the meaning given to it in Section 3(b).

BLM: means the Bureau of Land Management.

BLM Assignment: has the meaning given to it in Section 2(a)(3).

BLM Property:  means certain federal land owned by the BLM located in Kern County, California, as more particularly described on Exhibit A attached hereto.

Building Leases:  has the meaning given to it in Section 2(e).

Commercial Operation Date: has the meaning given to it in Section 3(a)(3).

County:  means the County of Kern, a political subdivision of the State of California.

Edwards AFB Approval: has the meaning given to it in Section 7(a).

Effective Date: has the meaning set forth in the opening paragraph of this Agreement.

Encumbrance: has the meaning given to it in Section 6(b).

Environmental Studies: has the meaning given to it in Section 8(c).

Excess Capacity Payment: has the meaning given to it in Section 3(a)(3).

Extended Option Term: has the meaning given to it in Section 3(c).

First Period:  has the meaning given to it in Section 11(a)(1).

Homestead: has the meaning set forth in the opening paragraph of this Agreement.

Homestead Acquisition Price:  has the meaning given to it in Section 11(a)(1).

Homestead Property: has the meaning given to it in the Recitals of this Agreement.

Indemnified Parties:  has the meaning given to it in Section 10(b).



Indemnifying Parties:  has the meaning given to it in Section 10(a).

Indemnification Agreement:  has the meaning given to it in Section 9(c).

Investments Property: means the real property owned by Investments located in Kern County, California, as more particularly described on Exhibit A attached hereto.

Lease: has the meaning given to it in Section 2(a)(1).

Lease Commencement Date: means the date on which the Owners and Homestead execute and deliver counterparts of the Lease to the other.

Lease Form: has the meaning given to it in Section 2(a)(1).

Memorandum of Lease: means the form of Memorandum of Lease to be attached as Annex 1 to the Lease.

Met Tower Facilities: means, collectively, all signs, fences and other safety and protection facilities, and other improvements, facilities, appliances, machinery and equipment in any way related to or associated with the Met Towers.

Met Towers: means meteorological towers, anemometers and related facilities used for the purposes of determining the feasibility of wind energy conversion on the Project Property, including studies of wind speed, wind direction and other meteorological data.

Operation Anniversary Date: has the meaning given to it in Section 3(a)(3).

Option: has the meaning given to it in Section 2(a).

Option Notice: has the meaning given to it in Section 4.

Owners' Property: has the meaning given to it in the Recitals of this Agreement.

Party or Parties: has the meaning set forth in the opening paragraph of this Agreement.

Pending Properties:  has the meaning set forth in Section 2(d)(ii) of this Agreement.

Project: has the meaning given to it in the Recitals of this Agreement.

Project Property: has the meaning given to it in the Recitals of this Agreement.

Purchase Agreement: has the meaning given to it in Section 2(a)(2).

Restricted Transaction:  has the meaning given to it in Section 11.

RLC: has the meaning set forth in the opening paragraph of this Agreement.

RLC Property: means the real property owned by RLC located in Kern County, California, as more particularly described on Exhibit A attached hereto.



RMC: has the meaning set forth in the opening paragraph of this Agreement.

RMC Rights:   means those certain rights to the BLM Property pursuant to the applications, filings, easements and right-of-way grants made or obtained by RMC identified on Exhibit A hereto.

Second Period:  has the meaning given to it in Section 10(a)(1).

Term: has the meaning given to it in Section 3(c).

Termination Date: has the meaning given to it in Section 10(c).

Title and Permitting Activities: has the meaning given to it in Section 7(a).

Title Company: has the meaning given to it in Section 5(c).

Title Policy: has the meaning given to it in Section 5(c).

Wind Data: has the meaning given to it in Section 7(c).

Wind Power Facilities: has the meaning given to it in the Recitals of this Agreement.


Section 2.        GRANT OF EXCLUSIVE OPTION.

(a)      Owners hereby unconditionally and irrevocably grant, bargain, sell and convey to Homestead, the exclusive right and option (the "Option") to:

(1) Lease the RLC Property, the BLM Property and/or the Investments Property in accordance with the terms and conditions of a Wind Energy Lease Agreement to be entered into, which Wind Energy Lease Agreement shall contain the provisions set forth on Exhibit C (the "Lease Form") and such other terms and conditions upon which the Parties agree pursuant to Section 4 (as so finalized, the "Lease");

(2) Purchase the RLC Property and/or the BLM Property in accordance with the terms and conditions of a Purchase Agreement to be entered into, which Purchase Agreement shall contain the provisions set forth on Exhibit D and such other terms and conditions upon which the Parties agree pursuant to Section 4 (as so finalized, the "Purchase Agreement"); and/or

(3)      receive from RMC an assignment, sublease, sub-easement or other conveyance of the RMC Rights in accordance with the form of assignment customarily provided by the BLM (the "BLM Assignment"); provided, that the economic terms governing the BLM Assignment shall be the same as the economic terms contained in the Lease Form under the heading "Rent," and the Parties shall use commercially reasonable efforts to cause the other terms and conditions of the BLM Assignment to be substantially similar to the terms and conditions contained in the Lease Form.

(b)     Notwithstanding anything herein contained to the contrary, the Parties understand that, in the event the Option is exercised, the Owners shall sell and/or lease all of the Owners' Property to Homestead in the manner identified by Homestead in the Option Notice, except that (i) Homestead shall only have the option to lease the Investments Property and (ii) if RMC does not acquire the BLM Property on or prior to the date of the Option Notice, then the BLM Property shall be transferred to Homestead pursuant to the BLM Assignment.

(c)     During the Term, neither Owner shall grant an option or other right for the use of the Owners' Property that could in any manner conflict with, be detrimental to or interfere with Homestead's rights to pursue the development (with the exception of the activity described in Section 2(e) of this Agreement), construction and operation of Wind Power Facilities on the Owners' Property or any right related thereto, or could otherwise result in a breach of any representation or covenant contained in this Agreement or any Lease, Purchase Agreement or BLM Assignment that may be entered into by the Parties pursuant to this Agreement.

(d)     By executing this Agreement, each Owner acknowledges that (i) such Owner has the full power and authority to enter into and perform its obligations under this Agreement, (ii) except for the properties listed on Schedule 1 to Exhibit A (the "Pending Properties"), such Owner holds fee simple title to the RLC Property and the Investments Property and is the sole owner of the RLC Property and the Investments Property, and (iii) such Owner holds the rights to transferable interests in the BLM Property and is the sole holder of such rights. Each Owner shall use its best efforts to cause the Pending Properties to be transferred to RLC on or before six months after the Effective Date.

(e)     Notwithstanding anything herein contained to the contrary, during the Term Owners shall have the right to construct six buildings on the Investments Property and access to the six buildings in the area identified on the map attached hereto marked Exhibit G and are contemplated by Owner to be leased to third parties ("Building Leases"); provided that such building(s) shall be placed on the Investments Property and be placed so as to minimize impacts to the wind turbine layout and as long as the construction, operation and leasing of such buildings do not interfere with the construction or operations of the Wind Power Facilities or any Project. Owner shall seek approval from Homestead prior to construction of the buildings and access thereto and Homestead shall not unreasonably withhold approval for Owner to build such buildings and access thereto. The buildings shall not exceed a height of 50 feet above the ground level or exceed and area of 75,000 square feet of rooftop in the aggregate.

Section 3.     CONSIDERATION; TERM OF OPTION.

(a)     Consideration.

(1)     The Option is granted in consideration of payments by Homestead to Owners (i) in an amount equal to Fifty Thousand Dollars ($50,000) payable to RLC and Fifty Thousand Dollars ($50,000) payable to Investments by check within thirty (30) days of the Effective Date and (ii) if required in accordance with Section 3(c)(2), within thirty (30) days of Homestead's exercise of its right to extend the term of this Agreement.

(2)     The development-related activities described in this Agreement will be performed by Homestead in consideration of the payments by Homestead to RLC of the amounts set forth in Section 6 hereof and subject to the terms and conditions set forth in this Agreement.

(3)     The following additional consideration shall only be due and owing if an entity comprising Owners or an affiliate thereof is not a general or prime contractor in the construction of the Project (and Homestead is under no obligation to hire any such entity or affiliate as a general or prime contractor in the construction of the Project): as additional consideration for the Option herein granted, Homestead agrees to pay to Owners, within sixty (60) calendar days after the date the Project commences energy sales on a commercial basis (the "Commercial Operation Date") which is also known as substantial completion, a payment equal to Five Thousand and No/100 Dollars ($5,000.00) per each megawatt of nameplate capacity of all of the wind turbines that have been installed on the Project Property as of the Commercial Operation Date (as may be adjusted as provided below, the "Base Megawatt Capacity"). On the anniversary of the Commercial Operation Date (such day being the "Operation Anniversary Date") and continuing on each Operation Anniversary Date of each calendar year thereafter until the first to occur of (a) the date that is thirty-five (35) calendar years after the Commercial Operation Date, (b) the expiration or termination of the Lease and (c) the dismantling and removal from the Project Property of the Wind Power Facilities (the "Additional Consideration Period"), in the event, and only in the event, that the aggregate nameplate capacity in megawatts of all of the wind turbines that have been installed on the Project Property as of such Operation Anniversary Date is in excess of the Base Megawatt Capacity (as may be adjusted pursuant to the terms hereof), Homestead shall be required to pay to Owners, within sixty (60) calendar days of such Operation Anniversary Date, an amount equal to Five Thousand and No/100 Dollars ($5,000.00) per each megawatt of incremental nameplate capacity that have been installed on the Project Property as of such Operation Anniversary Date, but only to the extent of such nameplate capacity that is in excess of the Base Megawatt Capacity as of such Operation Anniversary Date (such payment being an "Excess Capacity Payment"). In the event Homestead makes an Excess Capacity Payment to Owner, then the Base Megawatt Capacity shall be adjusted to the amount of the nameplate capacity of all of the wind turbines which have been installed on the Project Property as of the Operation Anniversary Date with respect to which such Excess Capacity Payment was made. Notwithstanding anything in this Section 3(a)(3) to the contrary, in no event shall Homestead be required to pay Owners an aggregate consideration pursuant to this Section 3(a)(3) in excess of an amount equal to Five Thousand and No/100 Dollars ($5,000.00) multiplied by the highest Base Megawatt Capacity on the Commercial Operation Date or any Operation Anniversary Date, as applicable, during the Additional Consideration Period.

(b)     Base Option Term.     The term of this Agreement shall commence on the Effective Date, and shall continue for five (5) years expiring on the fifth anniversary of the Effective Date (the "Base Option Term"), unless extended pursuant to the terms of Section 3(c) below or unless earlier terminated pursuant to the terms hereof.

(c)     Extended Option Term.     Homestead shall have the right to extend the Base Option Term for an additional two (2) years beyond the Base Option Term (the "Extended Option Term", together with the Base Option Term, the "Term"), upon satisfaction of the following conditions:

(1)     Homestead notifies the Owners in writing of its intent to extend the Base Option Term no later than thirty (30) days before the expiration of the Base Option Term;

(2)     Homestead tenders its check in the amount of (i) Two Hundred and Fifty Thousand Dollars ($250,000) made payable to RLC, (ii) Two Hundred and Fifty Thousand Dollars ($250,000) made payable to Investments; and

(3)     Homestead is not in default at the time notice of such extension is given or, if Homestead is in default at such time, Homestead has undertaken to cure such default and such default is cured prior to the end of the Base Option Term.

If the Extended Option Term goes into effect, it shall expire on the date that is two (2) years after the expiration date of the Base Option Term, unless earlier terminated pursuant to the terms hereof.

Section 4.     METHOD OF EXERCISING OPTION.

In the event Homestead elects to exercise the Option at any time during the Term, Homestead shall:

(a)     give written notice to the Owners specifying that the Option is exercised (the "Option Notice"), which notice shall (i) identify all or any portion of the Owners' Property that Homestead has elected to lease, (ii) identify all or any portion of the Owners' Property that Homestead has elected to purchase and (iii) in the event RMC has not purchased the BLM Property on or prior to the date of the Option Notice, indicate that Homestead will receive the BLM Assignment;

(b)     deliver to Owners a copy of the proposed Wind Energy Lease Agreement covering the Owners' Property that Homestead has elected to lease and containing the provisions set forth on Exhibit C and any additional terms and conditions that Homestead believes are reasonable;

(c)     deliver to Owners a copy of the proposed Purchase Agreement covering the Owners' Property that Homestead has elected to purchase and containing the provisions set forth on Exhibit D and any additional terms and conditions that Homestead believes are reasonable; and

(d)     if applicable, deliver to Owners a copy of the BLM Assignment.

Within 60 days after Owner's receipt of the Option Notice, Owners and Homestead shall negotiate in good faith and use commercially reasonable efforts to reach agreement on the final additional terms and conditions relating to the Lease and Purchase Agreement. Upon the finalization of such additional terms and conditions, Owners shall execute three (3) counterparts of (1) the Purchase Agreement, (2) the Lease, (3) the BLM Assignment (if applicable) and (4) a Memorandum of Lease with respect to the leased Owners' Property, and then Owners shall forward such counterparts to Homestead, which shall execute such counterparts and return one of each to the Owners. Homestead shall be entitled to record the Memorandum of Lease in the office of the County Clerk of Kern County, California.



Section 5.     DILIGENCE; CERTAIN COVENANTS.

(a)     Diligence. Within five (5) business days after the Effective Date, Owners shall deliver to Homestead full and complete copies of all documents and other items in Owners' possession or under its control relating to the Owners' Property, including, without limitation: vesting deeds, surveys, tests, studies, reports, inspections, and/or assessments regarding the Owners' Property; any plans and/or specifications relating to any improvements on the Owners' Property; any leases, easements or other agreements allowing occupancy or use of all or any portion of the Owners' Property; any soils reports; and any reports regarding the existence or non-existence of toxic or hazardous wastes, materials or substances on or under the Owners' Property. Notwithstanding the foregoing, Owner shall not be obligated to share the building plans for the new buildings to be constructed as identified in Section 2 (e) to this Agreement nor the leases for the building on the Investments Property. From the Effective Date until the Closing Date (as defined in the form of Purchase Agreement attached as Exhibit D hereto) or the Lease Commencement Date, as applicable, Homestead shall have the right to review such documents and other items and investigate the feasibility of the Owners' Property for Homestead's intended use, including, without limitation, (i) the title to the Owners' Property, (ii) the physical condition of the Owners' Property and (iii) the availability of zoning and other governmental entitlements and permits needed for Homestead's intended use of the Owners' Property, and Owners shall fully cooperate with such review and investigation.

(b)     Encumbrances. Except for the Building Leases permitted in Section 2 (e) hereof, each Owner agrees not to permit any liens, encumbrances, covenants, conditions, reservations, restrictions, leases, subleases, mineral reservations, easements, rights of way or other title matters (each, an "Encumbrance") to attach to the Owners' Property or any part thereof between the Effective Date and the Closing Date or Lease Commencement Date, as applicable, including, without limitation, any Encumbrances arising out of or in connection with Owners' use of the Owners' Property. If Homestead discovers any Encumbrances or any other adverse matter affecting the Owners' Property or any portion thereof (other than liens requiring the payment of money), that attached thereto prior to the Effective Date, then Owners shall promptly and fully cooperate with Homestead in the removal of the same at Homestead's cost; provided, however, that any monetary liens against the Owners' Property or any part thereof shall be paid by Owners, and Homestead shall take title free and clear thereof.

(c)     Title Insurance. In the event Homestead elects to exercise the Option, Homestead shall be entitled to obtain, from such title company as Homestead may designate (the "Title Company"), one or more ALTA extended coverage lessee's and/or owner's policies of title insurance (the "Title Policy"), with such liability as Homestead may determine, insuring that fee or leasehold title to the Owners' Property, as applicable, will vest in Homestead subject only to (i) nondelinquent general and special real property taxes and assessments constituting a lien as of the date of issuance of the Title Policy, and the lien of supplemental taxes (if any), pursuant to the provisions of Chapter 3.5 of the California Revenue and Taxation Code and (ii) any Encumbrances that remain on the Owners' Property despite the efforts of the Parties under Section 5(b).

(d)     Preliminary Remediation Activities.     In anticipation of potential compliance matters associated with permits and licenses for the Project, the Owners agree to take





reasonably appropriate measures of remediation and mitigation of any toxic or hazardous substances necessary to convey, lease and assign (as applicable) the Owners' Property to Homestead (or its permitted successor), free and clear of such toxic or hazardous substances, including remediation and mitigation measures relating to (i) any underground tanks that may be located on the Owners' Property, (ii) any toxic or hazardous substances that may have been generated, treated, stored, disposed of or otherwise deposited in or on or allowed to emanate from the Owners' Property, and (iii) any other substances or conditions in, on or emanating from the Owners' Property or any portion thereof which may support a claim or cause of action under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Carpenter-Presley-Tanner Hazardous Substance Account Act, the California Hazardous Waste Control Law, the Porter-Cologne Water Quality Control Act or any other applicable environmental law (collectively, "Adverse Environmental Conditions"). Notwithstanding the foregoing, in the event any Adverse Environmental Conditions are discovered and the Owners elect not to take reasonably appropriate measures of remediation and mitigation with respect to such Adverse Environmental Conditions, then Homestead shall have the right to terminate this Agreement in full or remove certain portions of the land from the Owners Property and Project Property, effective upon the receipt by Owners of a written notice of termination, and upon such termination (A) Homestead shall receive a refund of all amounts paid to Owners through the date of termination, including any amounts paid to Owners under Section 3 or Section 6, and (B) except as otherwise expressly stated herein, the Parties shall have no further rights or obligations hereunder.

(e)     Homestead Property. During the Term, Homestead shall have the exclusive right for the Term of this Agreement to acquire any real property interest in all or any portion of the Homestead Property at a price and upon terms and conditions to be determined by Homestead in its sole discretion. During the Term of this Agreement, Owners agree that Owners shall not interfere or compete with Homestead in any manner in the acquisition of any such real property interest in the Homestead Property by Homestead. In the event Homestead and Owners agree that certain areas identified on Exhibit B are not necessary or suitable for the Project or that additional property not reflected on Exhibit B is necessary for the Project, the Parties shall amend Exhibit B as necessary. Further, Homestead covenants and agrees that, on and prior to the Termination Date, to the extent Homestead has acquired any real property interest in any or all of the Homestead Property, Homestead (i) will hold such real property interest of record of any or all Homestead Property acquired pursuant to this Agreement and (ii) will not assign or transfer any such Homestead Property to any person or entity without the written consent of Owners.

(f)     BLM Property. From and after the Effective Date, the Owners agree to use commercially reasonable efforts to purchase the BLM Property or enter into a long-term lease or easement with respect to such BLM Property. In the event Owners enter into a long-term lease or easement with respect to the BLM Property, the Owners shall use commercially reasonable efforts to ensure that the execution and delivery by Owners to Homestead of the BLM Assignment does not require the consent or approval from the BLM. The Owners shall cooperate and work together with Homestead in Owners' efforts in entering into long-term arrangements for the BLM Property and, where appropriate, shall permit Homestead to negotiate directly with the BLM on the Owners' behalf. Notwithstanding the foregoing, the Parties agree



to consult with one another prior to entering into any definitive agreement to acquire the BLM Property or entering into a long-term lease or easement with respect to the BLM Property.

Section 6.    HEIGHT RESTRICTIONS; APPROVALS.

(a)    Edwards AFB Approval. As soon as practicable but in any event no later than two (2) years after the Effective Date, the Owners agree to deliver to Homestead a detailed map evidencing that any structures erected on the Project Property may not exceed the current military height restrictions of 600 feet (or more) above ground level with respect to approximately two-thirds (2/3) of the Project Property, and 400 feet (or more) above ground level with respect to approximately one-third (1/3) of the Project Property. Upon Homestead's receipt from Owners of a letter from the R-2508 Complex Sustainability Office of the Edwards Air Force Base, California, indicating that so long as the Wind Turbine Facilities do not exceed the military height restrictions depicted on the detailed map, the Project will not impact the military operations in the area (the "Edwards AFB Approval"), Homestead will pay RLC an additional One Hundred Thousand Dollars ($100,000) and Investments an additional One Hundred Thousand Dollars ($100,000); provided, that in the event Homestead does not obtain the Edwards AFB Approval on or prior to the date that is two (2) years after the Effective Date, then the Owners shall not be entitled any compensation or reimbursement for expenses relating to the Edwards AFB Approval.

(b)    Airport Approval. As soon as practicable but in any event no later than two (2) years after the Effective Date, the Owners will deliver to Homestead an approval from the Mojave airport in Mojave, CA to install Wind Turbine Facilities on the Project Property that do not to exceed 600 feet above ground level (the "Airport Approval"). Upon receipt of the Airport Approval, Homestead will pay RLC an additional One Hundred Thousand Dollars ($100,000) and pay Investments Roberts an additional One Hundred Thousand Dollars ($100,000); provided, that in the event Homestead does not obtain the Airport Approval on or prior to the date that is two (2) years after the Effective Date, then the Owners shall not be entitled any compensation or reimbursement for expenses relating to the Airport Approval.

Section 7.    WIND MONITORING DEVICES AND STUDIES.

(a)    Activities and Studies. During the Term, Homestead, and its employees, agents, designees, consultants, contractors and representatives (collectively "Representatives") shall have the right to enter upon the Owners' Property for purposes of (i) installing the temporary Met Towers described in Section 7(b) below and (ii) conducting activities reasonably related to the development of the Wind Power Facilities, including the performance of all studies and surveys associated therewith, and may perform, or cause to be performed, such other tests and studies as Homestead may desire in connection with the Option and the Project, including, without limitation, environmental, avian, biological and cultural resource assessments, geotechnical, foundation and soil tests (including drilling and borings), title reports and land surveys (collectively, the "Title and Permitting Activities"), together with the right of egress and ingress, at Owners' approved points of ingress and egress, over and across the Owners' Property. Whenever requested by Homestead, each Owner agrees to use its reasonable efforts to assist Homestead with the Title and Permitting Activities. Without limiting the foregoing, RLC and Investments, as applicable, agree to (A) grant to Homestead and its Representatives licenses or



other rights necessary to permit Homestead, and its Representatives to access and enter onto the RLC Property and the Investments Property and (B) either grant to Homestead and its Representatives or use its reasonable efforts to obtain licenses or other rights necessary to permit Homestead, and its Representatives, to access and enter onto the BLM Property, in each case for purposes of undertaking the Title and Permitting Activities.  Owners authorize Homestead to process and obtain any and all land use permits and/or changes including but not limited to the zone change, variance and conditional use permits in connection with the Project.   Further, Homestead shall have the right to meet with governmental agencies and with any other persons or entities with whom Owners has contractual arrangements relating to, or which have jurisdiction over or an interest in, the Project Property or any portion thereof.  Homestead will notify Owners by telephone or other notice given in accordance with this Agreement five (5) calendar days, or as soon as reasonably possible, in advance of the arrival of any Representatives performing such activities. In the event, during the course of conducting Title and Permitting Activities on the BLM Property, that Homestead or its Representatives violate any rule or regulation of the BLM applicable to the BLM Property in such a manner that results in the irrevocable cancellation of the Owners' rights in and to the BLM Property, then Homestead shall not be permitted to apply for a right-of-way from the BLM for the BLM Property or any portion thereof for a period of 35 years.  Homestead covenants and agrees that any Representative that accesses the Owners' Property or performs any portion of the Title and Permitting Activities will, unless Homestead's insurance provides coverage for such person or entity and the performance of the Title and Permitting Activities, maintain insurance to the same extent and in the same amount of the coverage maintained by Homestead and shall, upon the request of Owners, evidence same to Owners prior to performing the Title and Permitting Activities.

(b)     Installation of Met Towers.   The Parties acknowledge that an Owners representative installed two 50-meter Met Towers and Met Tower Facilities in the southwest portion of the proposed Project boundary approximately three-and-a-half years prior to the Effective Date.  Homestead agrees to install, for the benefit of the Project, one or more temporary 50-meter Met Tower and Met Tower Facilities in an appropriate location to be determined by Homestead on the Project Property as soon as practicable.

(c)     Ownership of Wind Data and Environmental Studies.   Owners hereby transfer and set over to Homestead any and all existing meteorological data that has been previously collected by Owners on the Owners' Property, including that which has been derived from each Met Tower.  During the Term, Homestead shall have the exclusive use and ownership of, and obligation to maintain, all meteorological data relating to the Project, including that which is derived from each Met Tower (the "Wind Data") and any environmental studies and reports obtained by Homestead with respect to the Project ("Environmental Studies").  During the Extended Option Term, however, Homestead shall grant the Owners a license to use the Wind Data and any Environmental Studies for the limited purpose of sharing such information, on a confidential basis, with any potential investors in a wind power project in and around the Project Property; provided, that Owners shall not provide copies or otherwise disclose such Wind Data or Environmental Studies to any parties during the Extended Option Term.  Upon the expiration of the Term and provided Homestead has not exercised the Option, each of Homestead and Owners will be entitled to use the Wind Data and Environmental Studies.

Section 8.    RECIPROCAL REPRESENTATIONS AND WARRANTIES. Owners represents and warrant to Homestead, and Homestead represents and warrants to Owners, that:

(a)    In the case of RLC and Homestead, such Party is duly incorporated or organized and validly existing under the laws of its state of incorporation or organization.

(b)    In the case of RLC and Homestead, such Party has full corporate or limited liability company power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby, and no other corporate or limited liability company action is necessary to perform its obligations or consummate such transactions.

(c)    The execution, delivery and performance of this Agreement and the consummation of transactions contemplated hereby does not and will not (i) conflict with any other agreement, arrangement, consent or order to which such Party may be a party or subject or (ii) in the case of RLC and Homestead, violate or conflict with any provision of the articles of incorporation, certificate of formation, limited liability company agreement, bylaws or other governing document of such Party.

(d)    This Agreement has been duly executed and delivered by such Party and is the legal, valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect that affect the enforcement of creditors' rights generally, by equitable limitations on the availability of specific remedies and by principles of equity.

(e)    Other than has been obtained in writing by such Party, no consent, waiver, agreement, approval, or authorization of, or declaration, filing, notice or registration to or with, any governmental agency or authority or any other Person (i) is required for the execution, delivery and performance by such Party of this Agreement or the transactions contemplated hereby or (ii) is necessary in order to ensure the legality, validity, binding effect or enforceability of this Agreement against such Party.

(f)    No Person has acted on behalf of such Party or any affiliate thereof in connection with the transactions contemplated by this Agreement, and no Person is or will be entitled to any brokerage or finder's commission, fee or similar compensation from the other Party as a result of any act or promise made by or on behalf of such Party or any affiliate thereof, or for any bonus payable to any agent or representative of such Party upon consummation of the transactions contemplated by this Agreement.

(g)    There are no claims, actions, proceedings or investigations (which with respect to investigations are limited to investigations the existence of which the Party has notice) pending, or to the Party's knowledge threatened, against or relating to the Party, that if adversely determined could reasonably be expected to result in the issuance of an order restraining or otherwise enjoining, prohibiting or making illegal the consummation of the transactions contemplated by this Agreement or the performance of the Party's obligations hereunder.

Section 9.    INDEMNITIES.

     (a)    Indemnification for Breach.   Each Party (the "Indemnifying Party") shall indemnify, defend and hold harmless the other Parties and its members, directors, officers, employees, agents and affiliates (collectively, the "Indemnified Party") from and against and reimburse the Indemnified Party for any and all claims, obligations, liabilities, losses, damages, injuries (to person, property, or natural resources), penalties, taxes, actions, suits, judgments, costs and expenses (including attorneys' fees) of whatever kind or nature, demanded, asserted or claimed against any such Indemnified Party in any way relating to, or arising out of, directly or indirectly, or in connection with any breach by Indemnifying Party of any of the covenants, representations and warranties made by Indemnifying Party in this Agreement.

     (b)    Procedure for Indemnification.    When required to indemnify a Indemnified Party, the Indemnifying Party shall assume on behalf of such Indemnified Party and conduct with due diligence and in good faith the defense of any claim against such party, whether or not the Indemnifying Party shall be joined therein, and the Indemnified Party shall cooperate with the Indemnifying Party in such defense. The Indemnifying Party shall have charge and direction of the defense and settlement of such claim; provided, however, that without relieving the Indemnifying Party of its obligations hereunder or impairing the Indemnifying Party's right to control the defense thereof, the Indemnified Party may elect to participate through separate counsel in the defense of any such claim; provided, further, that in the event that the Indemnified Party and the Indemnifying Party are jointly and severally liable with respect to the claim being indemnified, no settlement shall be entered into by either Indemnifying Party without the prior consent of the other, which shall not be unreasonably withheld.  The fees and expenses of counsel retained by the Indemnified Party shall be at the expense of such Indemnified Party unless (i) such Indemnified Party shall have reasonably concluded that there exists a material conflict of interest between the Indemnifying Party and such Indemnified Party in the conduct of the defense of such claim (in which case the Indemnifying Party shall not have the right to control the defense or settlement of such claim, on behalf of such Indemnified Party but no settlement shall be entered into without the consent of the Indemnifying Party, which shall not be unreasonably withheld), or (ii) the Indemnifying Party shall not have employed counsel to assume the defense of such claim within a reasonable time after notice of the commencement thereof (and in each of such cases the reasonable fees and expenses of counsel shall be at the expense of the Indemnifying Party).  All payments made in respect of indemnities provided under this Section 9 shall be made on an after-tax basis to the extent that the payment of such indemnity is taxable or gives rise to a tax liability of the Indemnified Party.

(c )    Owner shall enter into an indemnification agreement with the County, in accordance with the terms and conditions of an indemnification agreement which shall contain the provisions set forth in Exhibit F ("Indemnification Agreement") at the time Homestead submits applications to the County for changes in the land use including any zone change applications.  Homestead agrees to defend, indemnify and hold harmless Owner from any claim, action or proceeding against the Owner arising out of or in connection with the indemnification obligation of the Owner pursuant to paragraph 1 of the Indemnification Agreement, including, without limitation,



all fees, costs and expenses incurred by Owner related to such indemnification obligation under the Indemnification Agreement. If a claim, action or proceeding is asserted against the Owner under paragraph 1 of the Indemnification Agreement, the Owner shall give Homestead prompt written notice of such claim, action or proceeding setting from the particulars associated with such claim, action nor proceeding (including a copy of any written claim received by the County or any third party marking a claim against the County) as then known by the Owner. Thereafter, Homestead shall control the defense of any such claim, action or proceeding, subject to the County's discretion to participate in such defense pursuant to paragraph 3 of the Indemnification Agreement. The Owner agrees to make available to Homestead any documents and correspondence provided by the County pursuant to paragraph 2 of the Indemnification Agreement. All notices, requests, demands, instructions and other communications required or permitted to be given to Homestead hereunder shall be in writing and shall be delivered personally, mailed by certified mail, postage prepaid and return receipt requested or sent by telecopier to the party identified under Homestead in Section 14 of this Agreement. In the event Homestead assigns pursuant to Section 13, all of its rights and obligations under this Agreement, including its indemnity obligations under this Section 9 (c), Homestead shall have no continuing obligations under this Section 9 (c) and this Agreement.

Section 10.    TERMINATION; OPTION ON HOMESTEAD PROPERTY.

(a)    Termination of Option. Homestead may terminate the Option during the Term by giving written notice to Owners. If Homestead fails to pay the amounts payable by the dates specified therefor in Section 3(a), and such failure continues for thirty (30) business days after Homestead's receipt of notice thereof from Owners, the Option shall terminate. Upon any such termination, Homestead shall, upon the request of the Owners, execute and deliver to Owners a recordable release of all or portions of the Owners' Property so terminated under the Option.



(b)    Unexercised Option; Right to Purchase Homestead Property. If Homestead fails to exercise the Option within the Term, then the rights of Homestead granted hereunder with respect to the Option shall automatically and immediately terminate without notice or any liability whatsoever to Owners or Homestead and the Parties shall have no further rights or obligations with respect to such Option. Notwithstanding the foregoing, upon the expiration of the Term, the following shall apply:

(1)    Commencing on the expiration of the Term and continuing one year thereafter (the "First Period"), Owners shall have the exclusive right to purchase from Homestead any Homestead Property or real property owned by a wholly-owned subsidiary of Horizon Wind Energy LLC located within the Project Property boundary for an amount equal to Homestead's acquisition price of the Homestead Property ("Homestead Acquisition Price"), plus ten percent (10%) or a lower amount agreed to by the Parties;

(2)    Commencing on the expiration of the First Period and continuing for one year thereafter (the "Second Period"), Owners shall have the exclusive right to purchase any Homestead Property or real property owned by a wholly-owned subsidiary of Horizon Wind Energy LLC located within the Project Property boundary by entering into a purchase option agreement with Homestead on terms and conditions substantially similar to those set forth in





Exhibit D of this Agreement, except that (A) the purchase option shall automatically terminate upon the expiration of the Second Period, (B) Owners shall be required to pay Homestead a non-refundable earnest money deposit of an amount equal to ten percent (10%) of the Homestead Acquisition Price (which amount shall be credited against the purchase price in the event the closing occurs), and (C) the purchase price for the Homestead Property shall be an amount equal to the Homestead Acquisition Price, plus twenty percent (20%) or a lower amount agreed to by the Parties; and

(3)     Upon the commencement of the First Period the Parties may record an appropriate instrument in the office of the County Recorder of Kern County, California to evidence the rights of Owners to purchase any Homestead Property of which Homestead is the record owner in the time periods set forth above.

(c)     Termination of Agreement.   Upon the first to occur of (i) the closing of the transactions under Section 4, (ii) the closing of the purchase by Owners of all Homestead Property and (iii) the expiration of the Second Period (such date being the "Termination Date"), this Agreement and the rights of the Parties hereunder shall automatically and immediately terminate and, except as otherwise expressly stated herein, and the Parties shall have no further rights or obligations hereunder.

Section 11.     EXCLUSIVITY; NO NEGOTIATIONS.

Throughout the Term, none of the Owners and none of their respective affiliates, officers, directors or employees will, either directly or indirectly, (i) initiate, negotiate, encourage, entertain any offer or provide any information to facilitate, any proposal or offer (in each case whether solicited or unsolicited) or (ii) enter into any binding or non-binding agreement, in each case to acquire all or any part of the Owners' Property, whether by merger, purchase of assets, purchase of stock, tender offer or otherwise, and whether for cash, securities or any other consideration or combination thereof (each a "Restricted Transaction"). Owners shall promptly communicate to Homestead the terms of any proposal which it may receive in respect to a Restricted Transaction and any request by or indication of interest on the part of any third party with respect to initiation of any Restricted Transaction or discussions with respect thereto. Further, each Owner hereby represents that, as of the Effective Date, other than Homestead, there are no other parties with existing development rights in the Owners' Property.

Section 12.     CONFIDENTIALITY.

The Parties agree to keep confidential this Agreement and all location, data, reports, analyses, studies, ideas, drawings, specifications and other technical and proprietary information related to the Project Property and the construction and development of the Project, and the Parties will not disclose this Agreement or such information to any other person or entity. Notwithstanding the foregoing, Homestead may disclose such information to: (a) each of their affiliates, directors, officers, members, employees, attorneys, lenders, insurance brokers, agents and advisors; (b) any potential offtaker of the Project, including, but not limited to, Pacific Gas & Electric and the Los Angeles Department of Water and Power and each of their respective directors, officers, employees, attorneys, agents and advisors; (c) Patrick & Henderson, (d) Rich Simon, (e) Jones & Stokes, environmental consultants, (f) EDAW, Inc. (g) WEST, Inc and (h)



such other parties agreed to in writing by Owners and Owners may disclose such information to each of their affiliates, directors, officers, members, employees, attorneys, lenders, insurance brokers, agents and advisors; provided that in each case such parties shall have been informed of and have agreed to abide by the confidentiality restrictions set forth in this paragraph.

Section 13.   BINDING NATURE AND ASSIGNMENT.

Homestead shall have the absolute right at any time and from time to time, without obtaining each Owner's consent, to assign, or otherwise transfer all or any portion of its right, title or interest under this Agreement, to any person including any affiliate of Homestead. Owner shall have the right assign or transfer the BLM Rights from RMC to RLC at any time with notice provided to Homestead. Owners shall have the right, with Homestead's consent, to assign, or otherwise transfer all or any portion of its right, title or interest under this Agreement, to an affiliate of Owner, which approval by Homestead shall not be unreasonably withheld.

Section 14.   NOTICE.

Any notice or communication required or permitted to be given by any provision of this Agreement will be in writing and will be deemed to have been given when delivered personally or by telefacsimile (with a confirming copy sent within one (1) business day by any other means described in this Section) to the Party designated to receive such notice, or on the first business day following the day sent by nationally-recognized overnight courier, or the third (3rd) business day after the same is sent by certified mail, postage and charges prepaid, directed to the following addressees or to such other or additional addressees as either Party to this Agreement might designate by written notice to the other Party:



To Owners:                      Renewable Land, LLC.
                                P.O. Box 90
                                16922 Airport Blvd., Suite 27
                                Mojave, CA 93501
                                Attn: Sean G. Roberts, President, and Teresa Bryant
                                Telefacsimile:
                                E-mail Addresses: teresa@rmcllc.com
                                                  and sean@rmcllc.com


To Homestead:                   Homestead Wind Farm LLC
                                808 Travis, Suite 700
                                Houston, Texas 77002
                                Attention: Brenda LeMay and Leslie Freiman, Esq.
                                Telefacsimile: 713-265-0365
                                E-mail Address: leslie.freiman@horizonwind.com
                                                and brenda.lemay@horizonwind.com

If notices or other communications are required in this Agreement to be given within a specified period and the end of such period falls on other than a business day, such period shall be extended to the next business day. As used in this Agreement "business day" shall mean any day



other than a Saturday, Sunday, or holiday upon which national banks in Houston, Texas and New York, New York are closed for the conduct of business.

Section 15.    PERMITTED ACTIVITIES.

During the Term, Owners (and their respective assignees, consultants, designees, or representatives) shall have the right to make reasonable use of the Owners' Property, including but not limited to, the construction of the storage warehouse(s) described in Section 2(d); hunting; farming; livestock production; telecommunications; tourism; eco-tourism; rock, sand, and gravel production; and petroleum production activities at the Owners' Property, provided each Owner agrees not to interfere with, or allow interference with, the wind monitoring or other activities described in Section 7 above. Homestead, during the Term, shall not solicit or engage in any other activity on the Owners' Property that is not related to wind power production or the evaluation of the Owners' Property for its suitability for locating Wind Power Facilities on the Owners' Property.

Section 16.    AMENDMENTS.

This Agreement shall not be amended or modified in any way except by an instrument signed by Owners and Homestead.

Section 17.    GOVERNING LAW.

This Agreement shall be governed by and construed in accordance with the laws of the State of California without giving force and effect to its conflicts of law provisions. The Parties agree that the subject matter of this Agreement is unique, and that specific performance shall be available to enforce the obligations undertaken under this Agreement.

Section 18.    MEMORANDUM OF OPTION.

The Parties shall execute a Memorandum of Agreement in the form of Exhibit E attached hereto and made a part hereof and shall record such Memorandum of Agreement in the office of the County Recorder of Kern County, California. This Agreement shall not be recorded.

Section 19.    MISCELLANEOUS.

(a)    Further Assurances; Survival; Counterparts. The Parties shall at all times hereafter execute any documents and do any further acts that may be necessary or desirable to carry out the purposes or intent of this Agreement. The representations and warranties of Owners contained in this Agreement, and the various covenants of the Parties set forth herein, shall all survive the exercise of the Option and the granting of the assignment, lease or the sale of the Owners' Property (as applicable) to Homestead. This Agreement may be executed with counterpart signature pages and in duplicate originals, each of which shall be deemed an original, and all of which together shall constitute a single instrument.

(b)    Prior Agreements Superseded. This Agreement constitutes the Parties' sole and entire agreement and supersedes any prior understandings or written or oral agreements between the Parties with respect to the subject matter hereof which are of no further force or





effect.   The Exhibits referred herein are integral parts hereof and are made a part of this Agreement by reference.   The recitals at the beginning of this Agreement are hereby incorporated herein and expressly made a part of this Agreement.

          (c)     <u>Successors and Assigns; Runs with the Land</u>. The Owners' Property shall be held, conveyed, assigned, hypothecated, encumbered, leased, used and occupied subject to the Option and the covenants, terms and provisions set forth in this Agreement, which Option, covenants, terms and provisions shall run with the Owners' Property and each portion thereof and interest therein, and shall be binding upon and inure to the benefit of the Parties and any other person and entity having any interest therein during their ownership thereof, and their respective grantees, heirs, executors, administrators, successors and assigns, and all persons claiming under them.

<strong>SIGNATURES TO FOLLOW ON NEXT PAGE</strong>

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

OWNERS:

Renewable Land, LLC.,
a California limited liability company

By _____ President
Title: President

Renewable Management Corp.,
a California corporation

By _____ President
Title: President

Sean Garriff Roberts, Trustee of the Sean Garriff
Roberts 2005 Trust dba Roberts Investments,
a California trust

By _____
Title: Trustee

HOMESTEAD:

Homestead Wind Farm LLC,                    11-13-06
a Delaware limited liability company

By _____
          Title: _____
                 Michael P. Skelly
                 Vice President - Development

**Exhibit A**
**Owners' Property**

**Real Property Description.**

The **RLC Property** consist(s) of approximately 670 acres of land in Kern County, California as more specifically described below:

---

**Section 35, Township 12 North, Range 13 West**

---

PARCEL 1:
West Half, West Half, Southeast Quarter, Section 35, Township 12 North, Range 13 West, S.B.B. & M. ((Assessor's Parcel Number 22445025)

Excepting therefrom the North 249 feet thereof.

PARCEL 2:
South Half, West Half, East Half, Southwest Quarter, of fraction Section 35, Township 12 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 22445029)

Also excepting therefrom twenty-five percent (25%) of all oil, carbohydrates, minerals (metallic and non-metallic, boron, rate earth, rock, sand and gravel. Grantor herein shall not have the interest in proportion to above interest in the event oil, minerals, etc. are development as reserved by Earl W. Dible and Isable W. Dible, as community property in deed recorded January 13, 1969, in Book 4231 Page 301 of Official Records,

PARCEL 3:
South Half, North Half, Northwest Quarter, Southeast Quarter, Southeast Quarter, Section 35, Township 12 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 22445033)

Subject to all covenants, conditions, restrictions, reservations, rights, rights of way, and easements of record.

---

**Section 36, Township 12 North, Range 13 West**

---

PARCEL 4:
West Half, of Lots 1 and 2 in the Northwest Quarter, of Section 36, Township 12 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 22444001)



The plant of a dependent resurvey of said township was filed in the District Land Office, February 28, 1940. (Assessor's Parcel Number 22444001)

PARCEL 5:
Lot 2 in the Northeast Quarter, of Section 36, Township 12 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 22444003)

Excepting therefrom one-half of all oil, gas, minerals and other hydrocarbon substances in and under the land above described, as reserved by High F. Newman and December 10, 1975, in Book 4927, Page 2373 Official Records.  The plat of a dependent resurvey of said Township was filed in the District Land Office February 28th, 1940. (Assessor's Parcel Number 22444003)

PARCEL 6:
Lot 1 in the Northeast Quarter, of Section 36, Township 12 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 22444005)

Excepting therefrom the East Half, East Half, of said Lot 1 as conveyed to Frederick Carlson and Sulma Lee Carlson, husband and wife as joint tenants, in deed recorded March 3, 1970 in Book 4373 Page 987 of Official Records.

Also excepting therefrom the West Half, West Half, of said Lot 1, as conveyed to Nicholas C. Theodore and Pauline R. Theodore, husband and wife as joint tenants, in deed recorded June 27th, 1972 in Book 4892 page 551 of Official Records.

Also excepting therefrom one-half of all oil, gas, minerals and other hydrocarbon substances in and under said land as reserved by Hugh F. Newman and Marion L. Newman, husband and wife.

PARCEL 7:
The North Half, North Half, Northwest Quarter, Southwest Quarter, Section 36, Township 12 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 22444008)

| Section 02, Township 11 North, Range 13 West |
| --- |

PARCEL 8:
Lot 17, Section 2, Township 11. North, Range 13 West, S.B.B.M. Assessor's Parcel Number (237 121 02)

Except such oil, gas and all other mineral deposits together with the rights to prospect for, mine, and remove the same, as were required to be reserved to the United States by the act of June 1, 1938 (52 stat. 609) as amended and as reserved in the patent from the United States to Claire Gleason recorded February 27, 1962 in book 3467 page 73 of official records.

PARCEL 9:
Lot 22 of Section 2, Township 11 North, Range 13 West, S.B.B. & M.

East Half, Southeast Quarter, Northwest Quarter, Northwest Quarter of Section 2, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 237-121-29)

Excepting therefrom all oil, gas and other mineral deposits in the land so patented, together with the right to prospect for, mine and remove the same according to the provisions of said act of June 1, 1938 as excepted and reserved in patent by the united States of America recorded January 30, 1961 in Book 3343, page 995 of official records.

PARCEL 10:
Lot 36 of Section 2, Township 11 North, Range 13 West, S.B.B.M. Excepting therefrom all oil, gas and other mineral deposits in the land so patented, together with the right to prospect for, mine and remove the same.

According to the provisions of said act of June 1, 1938, as reserved by the United States of America, in patent recorded April 19, 1965 in Book 3832 page 729 of official records. Assessor's Parcel Number (237 122 14)

PARCEL 11:
Lot 51 in the North Half of Section 2, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 237-122-31)

Excepting therefrom to the United States all oil, gas and other mineral deposits in the land so patented, together with the right to prospect for, mine and remove the same according to the provisions of said act of June 1, 1938 as reserved by the United States of America in patent recorded January 30, 1961 in book 3343 page 995 of official records.

PARCEL 12:
The East Half, Northwest Quarter, Northwest Quarter, Southwest Quarter, of Section 2 Township 11 North, Range 13 West, S.B.B.M. Assessor's Parcel Number ( 237 131 02)

Excepting therefrom all oil, gas and other mineral Deposits in the Land so patented, together with the right to prospect for, mine and remove the same according to the provisions of said act of June 1, 1938, as reserved by the United States of America, in patent recorded February 8, 1960 in Book 3237, page 62 of official records.

PARCEL 13:
West Half, Southeast Quarter, Southeast Quarter, Southeast Quarter, Section 2 Township 11 North, Range 13 West, S.B.B.M. Assessor's Parcel Number (237 132 29)

Except the North 264 feet.

Also except all oil, gas and other mineral deposits in the lands so entered and patented, together with the right to prospect for, mine and remove the same pursuant to the provisions an limitations of the act of June 1, 1938  as reserved in the patent executed by the United States of America recorded January 16, 1961, in Book 3339 Page 85, of Official Records.



PARCEL 14:
East Half, Southwest Quarter, Southwest Quarter, Southeast Quarter, Section 2 Township 11 North, Range 13 West, S.B.B.M. Assessor's Parcel Number (237 132 34)

Except all oil, gas and other mineral deposits in said land, together with the right to prospect for, mine and remove the same according to the provisions of the act of June 1, 1938, as excepted by patent from the United States of America recorded December 8ᵗ 1969 in book 4344, page 887 of official records.

PARCEL 15:
The North 330 of the East 330 feet of the East Half, Southeast Quarter, Northeast Quarter, Southeast Quarter, Section 2 Township 11 North, Range 13 West, S.B.B.M.  Assessor's Parcel Number (237 132 37)

Excepting therefrom that portion of said land conveyed by Dorothy Morrow in deed recorded January 12 1965 in Book 3803 page 530 of Official Records.

Also except all the coal and other mineral deposits in the lands so entered and patented, together with the right to prospect for, mine and remove the same pursuant to the provisions an limitations of the act of June 1, 1938 (52 Stat. 609), as excepted and reserved in the patent executed by the United States of America recorded January 16, 1961, in Book 3339 Page 85, of Official Records.

**Section 10, Township 11 North, Range 13 West**

PARCEL 16:
The East Half, Northwest Quarter, Northwest Quarter, Northwest Quarter, Section 10, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 237-141-02)

Excepting therefrom all oil, gas and other mineral deposits in the land so patented, together with the right to prospect for, mine and remove the same pursuant to the provisions of some act of June 1, 1938 as reserved by deed recorded September 20, 1967 in Book 4090, page 851 of official records.

PARCEL 17:
The East Half, Southwest Quarter, Northwest Quarter, Northwest Quarter, Section 10, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 237-141-15)

Excepting therefrom all oil: gas and other mineral deposits in the land so patented, together with the right to prospect for, mine and remove the same according to the provisions of the act of June 1, 1938 (58 stat. 609) as reserved in by the USA. In patent recorded November 28, 1972 in Book 4750, page 484 of official records.



PARCEL 18:
East Half, Southeast Quarter, Southeast Quarter, Northwest Quarter, Section  10 Township 11 North, Range 13 West, S.B.B. & M.  (Assessor's Parcel Number 23714125)

Except all oil, gas and other mineral deposits, together with the right to prospect for, mine and remove the same according to the Provisions of said Act of June 1, 1938. (Assessor's Parcel Number 23714125) (Document Number 203062616)

PARCEL 19:
The West Half of the Northeast Quarter of the Northwest Quarter of the Northeast Quarter of Section 10, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 237-142-03)

Excepting therefrom all oil, gas and other mineral deposits in said land together with the right to prospect for, mine and remove the same according to the provisions of the act of June 1, 1938 and as reserved by the United States in the patent recorded November 17, 1972 in book 4747, page 619 of official records.

PARCEL 20:
The East Half of the Northeast Quarter of the Northwest Quarter of the Northeast Quarter of Section 10, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 237-142-04)



Expecting therefrom all oil, gas and other minerals as reserved in the patent recorded July 13, 1960 in book 3283, page 553 of the official records.

PARCEL 21:
The East Half, Northwest Quarter, Northeast Quarter, Northeast Quarter of Section 10, Township 11 North, Range 13 West, S.B.B. & M.  (Assessor's Parcel Number 237-142-06)

PARCEL 22:
The East Half , Southwest Quarter, Northeast Quarter,  Northeast Quarter of Section 10, Township 11 North, Range 13 West, S.B.B. & M. (Assessor Parcel No. 237-142-11)

Except all oil, gas and other mineral deposits together with the right to prospect for, mine and remove the same as reserved by the United States of America in patent recorded march 22, 1960 in book 3251 page 444 of official records.

PARCEL 23:
The East Half of the Southeast Quarter of the Northwest Quarter of the Northeast Quarter of Section 10, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 237-142-13)

Excepting therefrom all oil, gas and other mineral deposits together with the right to prospect for, mine and remove the same as were required to be reserved to the United States by the act of June





1, 1938 (52 stat. 609) as amended and reserved in the patent from the United States to bernard miles clayton, recorded august 29, 1961 in book 3410, page 76 of official records.

PARCEL 24:
West Half, Southeast Quarter, Northwest Quarter, Northeast Quarter, Section 10, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 23714214) (Document Number 202203620)

Excepting therefrom the South Half, East Half, West Half, Southeast Quarter, Northwest Quarter, Southwest Quarter of Section 10

Also Excepting therefrom all oil, gas and other mineral deposits, together with the right to prospect for, mine and remove the same according to the Provisions of said Act of June 1, 1938. As reserved by the United States of America in patent recorded October 26, 1961 in Book 3428, Page 365 of official records.

PARCEL 25:
West Half, Northwest Quarter, Southeast Quarter, Northeast Quarter, Section  10, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 23714221)

Except all oil, gas and other mineral deposits, together with the right to prospect for, mine and remove the same according to the Provisions of said Act of June 1, 1938.
(Assessor's Parcel Number 23714221)(Document Number 203278521)

PARCEL 26:
The West Half, Southwest Quarter, Southwest Quarter, Northeast Quarter of Section 10, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 237-142-32)

Excepting therefrom to the united States all oil, gas and other mineral deposits in the land so patented, together with the right to prospect for, mine and remove the same according to the provisions of the act of congress approved June 1, 1938 as reserved in patent recorded June 29, 1990 in Book 6400, page 2369 of official records.

PARCEL 27:
The West Half, West Half, Northwest Quarter, Northeast Quarter, Northeast Quarter of Section 10, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 237-142-33)

Excepting therefrom all oil, gas and other mineral deposits together with the right to prospect for, mine and remove the same according to the provisions of the act of congress approved June 1, 1938 (52 stat. 609) as reserved in the patent recorded march 25, 1960 in Book 3252, page 864 of official records.

PARCEL 28:
West Half, Southeast Quarter, Northwest Quarter, Northeast Quarter, Section  10, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 23715114) (Document Number 202203620)

Also Excepting therefrom all oil, gas and other mineral deposits, together with the right to prospect for, mine and remove the same according to the Provisions of said Act of June 1, 1938. As reserved by the United States of America in patent recorded October 26, 1961 in Book 3428, Page 365 of official records.

PARCEL 29:
The East Half, Southwest Quarter, Northwest Quarter, Southwest Quarter of Section 10, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 237-151-15)

Excepting therefrom all oil, gas and other mineral deposits together with the right to prospect for, mine and remove the same according to the provisions of the act of congress approved June 1, 1938 as reserved by the united States of America in patent recorded may 7, 1990 in Book 6379, page 2486 of official records.

PARCEL 30:
West Half, Southcast Quarter, Southeast Quarter, Southwest Quarter, Section 10 Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 23715126)(Document Number 202093705)

PARCEL31:
East Half, Northwest Quarter, Northeast Quarter, Southeast Quarter, Section 10, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 23715206)(Document Number 203278529)

Except all oil, gas and other mineral deposits, together with the right to prospect for, mine and remove the same according to the Provisions of said Act of June 1, 1938.   As reserved by the United States of America in patent recorded April 5, 1960 in Book 3256, Page 3265 of official records.

PARCEL32:
The East Half of the Southeast Quarter of the Southeast Quarter of the Southeast Quarter of Section 10, Township 11 North, Range 13 West, S.B.B. & M. (Assessor Parcel No. 237-152-25) (Document Number 203030515)

Except all oil, gas and mineral deposits in the land so patented, together with the right to prospect for, mine and remove the same according to the provisions of said act of June 1, 1938 as excepted and reserved by the United States of America in patent recorded November 23, 1960 in book 3323 page 611 of official records.

PARCEL 33:
East Half of the Southeast Quarter of the Southwest Quarter of the Southeast Quarter of Section 10, Township 11 North, Range 13 West, according to the official plat of said land, on file in the bureau of land management. (Assessor Parcel No. 237-152-29)



Excepting therefrom all oil, gas and other mineral deposits, together with the right to prospect for, mine and remove the same according to the provisions of the act of congress, approved June 1, 1938 (52 stat. 609), as reserved to the United States in the patent recorded December 30, 1959 in book 3224, page 620 of official records.

### Section 11, Township 11 North, Range 13 West

PARCEL 34:
Southwest Quarter, Northwest Quarter, Southwest Quarter, Northeast Quarter, exclusive of 50% interest mineral rights Section 11, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 23728510)(Document Number 203049431)

PARCEL 35:
Southeast Quarter, Northwest Quarter, Southwest Quarter, Northeast Quarter, and those portions of the Southwest Quarter, Northeast Quarter, Southwest Quarter, Northeast Quarter, Northeast Quarter, Southwest Quarter, Southwest Quarter, Northeast Quarter, Quarter, Section 11, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 23728511)(Document Number 204093710)

Excepting therefrom all oil, gas, minerals and other hydrocarbon substances within or underlying said land as reserved by M & R Sheep Company, a Co-Partnership composed of G. Mendiburu and Oscar Rudnick in deed recorded November 22, 1955 in Book 2519, Page 283, of Official Records.  (Assessor's Parcel Number 23728511)(Document Number 204093710)

### Section 15, Township 11 North, Range 13 West



PARCEL 36:
The Northwest Quarter, Northwest Quarter of Section 15, Township 11 North, Range 13 West, S.B.B. & M.  Assessor's Parcel Number 237-185-01

Excepting therefrom Half of all oil, gas and minerals and hydrocarbon substances under and in said land as reserved by m & r sheep co., in deed dated August 4, 1955 recorded November 22, 1955 in Book 2519, page 289 of official records. Also excepting therefrom all oil, gas and other hydrocarbon substances and minerals in and under said land not previously excepted or reserved as reserved

AND
The Northwest Quarter of tile Southwest Quarter of Section 15, Township 11 North, Range 13 West, S.B.B. & M. Assessor's Parcel Number 237-185-01

Excepting therefrom Half of all oil, gas and minerals and hydrocarbon substances in and under said land as reserved by m & r sheep co., in deed dated August 4, 1955 recorded November 22, 1955 in Book 2519, page 289 of official records. Also excepting therefrom all oil, gas and other hydrocarbon substances and minerals in and under said land not previously excepted or reserved



as reserved by Benjamin Winter, a married man, in deed recorded Winter31, 1986 in Book 5954,page 2182 of official records.

AND
The Southwest Quarter, Northwest Quarter of Section 15, Township 11 North, Range 13 West, S.B.B. & M. Assessor's Parcel Number 237-185-01

Excepting therefrom Half of all oil, gas and minerals and hydrocarbon substances in and under said land as reserved by m & k sheep co., in deed dated August 4, 1955 recorded November 22, 1955 in Book 2519, page 289 of official records.

Also excepting therefrom all oil, gas and other hydrocarbon substances and minerals in and under said land not previously excepted or reserved as reserved by Benjamin Winter, a married man, in deed recorded Winter 31, 1986 in Book 5954, page 2182 of official records.

PARCEL 37:
The Northeast Quarter, Northwest Quarter of Section 15, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 237-185-02)

Excepting therefrom half of all oil, gas and minerals and hydrocarbon substances as reserved by M & R Sheep Company, in deed dated August 4, 1955 and recorded November 22, 1955 in Book 2519, page 289 of official records.

PARCEL 38:
The Northeast Quarter, Southeast Quarter, Northwest Quarter of Section 15, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 237-185-04)

Excepting therefrom half of all oil, gas and minerals and hydrocarbon substances as reserved by M & R Sheep company, in deed dated August 4, 1955 and recorded November 22, 1955 in Book 2519, page 289 of official records. (Assessor's Parcel Number 237-185-04)



**Section 9, Township 11 North, Range 13 West**

PARCEL 39:
The East Half of the East Half of Section 9, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 237-022-13)

Excepting therefrom one half of all oil, gas and other hydrocarbon substances and minerals in and under said land, as excepted in deed dated December 1, 1955 from M&R Sheep Company, recorded March 22, 1956, in Book 2581, Page 233 official records.

The **Investments Property** consist(s) of approximately 200 acres of land in Kern County, California as more specifically described below:



## Section 10, Township 11 North, Range 13 West

PARCEL 1:
East Half, Southeast Quarter, Southwest Quarter, Southwest Quarter, Section 10 Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 23715129)(Document Number 203210889)

Except all oil, gas and other mineral deposits in the land so patented together with the right to prospect for, mine and remove the same according to the provisions of said act of June 1, 1938.

PARCEL2:
West Half, Southeast Quarter, Southwest Quarter, Southwest Quarter, Section 10, Township 11 North, Range 13 West, S.B.B. & M. (Document Number 061782265) (Assessor's Parcel Number 23715130)

PARCEL 3:
East Half, Southwest Quarter, Southwest Quarter, Southwest Quarter, Section 10 Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 23715131) (Document Number 2033210887)

Excepting therefrom all oil, gas and other mineral deposits, together with the right to prospect for, mine and remove the same according to the Provisions of said Act of June 1, 1938.   As reserved by the United States of America in patent recorded October 26, 1961 in Book 3428, Page 365 of official records.



PARCEL 4:
South Half, East Half, West Half, Southeast Quarter, Northwest Quarter, Southwest Quarter, Section 10, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 23715133)

Except all oil, gas and other mineral deposits, together with the right to prospect for, mine and remove the same according to the Provisions of said Act of June 1, 1938. as reserved in U.S. patent recorded October 26th, 1961 in Book 3428, page 365 of Official Records.

Subject to all covenants, conditions, restrictions, reservations, rights, rights of way, agreements, acknowledgments, comments, and easements of record, including, but not limited to, certain reservations, easements, acknowledgments and comments as set forth in the deed recorded on May 6, 2005, as documented no. 0205116435 of Kern County Official Records.

## Section 16, Township 11 North, Range 13 West

PARCEL 5:
The East Half, Northeast Quarter of Section 16, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 234-031-08)

Excepting therefrom said land an undivided 1/16th of all coal, oil, oil shale, gas, phosphate, sodium and other mineral deposits in said land as reserved to the State of California, by the provision of an act of the legislation, statutes of 1921 page 404 and amendments thereto.

Also excepting therefrom Half of all oil, hydrocarbons and similar minerals but without the right of entry to depth of 500 feet from the surface thereon in and to the property. As granted to I. J. Kessler, a married man, in deed recorded August 23, 1956 in Book 2654, page 300 of official records.

The **BLM Property** consists of approximately 520 acres of public land held in the name of the United States of America by and through the Bureau of Land Management in Section 2 and Section 10 in Township 11 North, Range 13 East, S.B.B. & M., in the County of Kern, State of California.

The **RMC Rights** means those certain rights to the BLM Property pursuant to the applications, filings, easements and right-of-way grants made, applied for or obtained by RMC identified as BLM Property in this Exhibit.

## Schedule 1 to Exhibit A

Section 36, Township 12 North, Range 13 West

APN 224-440-2
APN 224-440-6
APN 224-441-2
APN 224-442-3
APN 224-442-4

Section 01, Township 11 North, Range 13 West

APN 237-261-15

Section 4, Township 11 North, Range 13 West

APN 237-167-24

**Exhibit B**
**Map and Homestead Property**

The Homestead Property consist(s) of approximately 2,000 acres of land in Kern County, California as more specifically described below:

Those parcels of land, excepting those parcels of land described as Owner's Property, in the following areas located in the unincorporated County of Kern, State of California and within the dashed boundary as depicted on the map attached hereto:

In Township 12 North, Range 13 West, S.B.B. & M; all of Sections 35 and 36;

In Township 11 North, Range 13 West, S.B.B.& M.,
   a) All of Sections 2 and 10
   b) Those portions of the Northwest Quarter and the Southwest Quarter of Sections 1 and 11 whose southeastern boundary is the Los Angeles Aqueduct
   c) All of Section 15 whose southeastern boundary is the Los Angeles Aqueduct
   d) Those portions of the Northeast Quarter and the Southeast Quarter of Section 3 whose northwestern boundary is the operating wind farm known as Mojave 3, LLC.
   e) The East ½ of the East 1/2 of Section 9;
   f) The East ½ of the Northeast Quarter of Section 16



Mojave

Horizon Wind Energy • 1600 Shattuck Ave., Suite 126 • Berkeley, CA • 510.704.8152

Major Road
Wind Farm Boundary

5000 ft

**Exhibit C**
**Lease Terms**

Subject to <u>Section 3</u> of the Agreement, it is anticipated that the Lease to be entered into between Owner and Homestead shall contain provisions substantially similar to the provisions contained in this <u>Exhibit C</u> and such other terms and conditions as are customary in transactions of this nature or that are reasonably requested by Homestead. For purposes of the following provisions, Owner shall be identified as Lessor and Homestead shall be identified as Lessee.

**Lease**. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, that certain real property, including air space (the *"Property"*), located in Kern County (the *"County"*), in the State of California, as more particularly described on <u>Exhibit A</u> attached hereto (and as generally depicted on the map attached hereto as <u>Exhibit "A-1"</u>), upon all of the terms and conditions hereinafter set forth. Lessor and Lessee (together, the *"Parties"* and each a *"Party"*) agree that for purposes of this Lease, the Property consists of _____ (_____) acres of land.

**Purpose of Lease**. Pursuant to this Lease, Lessee shall have possession of the Property for the following purposes (collectively, *"Operations"*):

        a.    Determining the feasibility of wind energy conversion on the Property or on neighboring lands, including studies of wind speed, wind direction and other meteorological data;

        b.    Converting wind energy into electrical energy, and collecting and transmitting the electrical energy so converted;

        c.    Developing, constructing, reconstructing, erecting, installing, improving, replacing, relocating and removing from time to time, and using, maintaining, repairing, operating and monitoring, all or any one of the following, for the benefit of one or more Projects (as defined below): (a) wind machines, wind energy conversion systems and wind power generating facilities (including associated towers, foundations, support structures, braces and other structures and equipment), and other power generation facilities to be operated in conjunction with wind turbine installations, in each case of any type or technology (collectively, *"Generating Units"*); (b) transmission facilities, including overhead and underground transmission, distribution and collector lines, wires and cables, conduit, footings, foundations, towers, poles, crossarms, guy lines and anchors, substations, interconnection and/or switching facilities, circuit breakers and transformers, and energy storage facilities; (c) overhead and underground control, communications and radio relay systems and telecommunications equipment, including fiber, wires, cables, conduit and poles; (d) meteorological towers and wind measurement equipment; (e) roads and erosion control facilities; (f) control, maintenance and administration buildings; (g) utility installations; (h) laydown areas and maintenance yards; (i) signs; (j) fences and other safety and protection facilities; and (k) other improvements, facilities, appliances, machinery and equipment in any way related to or associated with any of the

Exhibit C to Wind Energy Development and Option Agreement



foregoing (all of the foregoing, including the Generating Units, collectively, *"Wind Power Facilities"*);

        d.      Vehicular and pedestrian ingress, egress and access to and from Wind Power Facilities on, over and across the Property by means of roads and lanes thereon if existing, or otherwise by such roads as Lessee or anyone else may construct from time to time, in each case for the benefit of one or more Projects (collectively, *"Access Rights"*);

        e.      Drilling, redrilling, maintaining, repairing, using, operating, improving, replacing, relocating, plugging and abandoning water wells, and pumping and using water as needed in connection with one or more Projects; and

        f.      Undertaking any other activities that Lessee or a Sublessee (as defined below) determines are necessary, helpful, appropriate or convenient in connection with, incidental to or to accomplish any of the foregoing purposes or for the benefit of one or more Projects, including conducting surveys and environmental, biological, cultural and other tests and studies. Without limiting the generality of the foregoing, the Parties recognize that (a) power generation technologies are improving at a rapid rate and that Lessee or a Sublessee may (but shall not be required to) from time to time replace existing Generating Units on the Property with newer model (and potentially larger) Generating Units and (b) the Operations may be accomplished by Lessee, a Sublessee or one or more third parties authorized by Lessee or a Sublessee.



**Easements**.

        a.      In addition, Lessor hereby grants to Lessee the following easements:

        (i)      A non-exclusive easement for audio, visual, view, light, flicker, noise, vibration, air turbulence, wake, electromagnetic, electrical and radio frequency interference, and any other effects attributable to any Project (as defined below) or Operations;

        (ii)      An exclusive easement to use, convert, maintain and capture the free and unobstructed flow of wind currents and wind resources over and across the Property; and

        (iii)      A non-exclusive easement and right for vehicular and pedestrian ingress, egress and access to and from the Wind Power Facilities and from adjacent lands on, over and across the Property by means of those certain existing roads and lanes thereon as designated on Exhibit _, or otherwise by such roads as Lessee or anyone else may construct from time to time as approved by Lessor which said consent shall not be unreasonably withheld, conditioned or delayed, as then designated on Exhibit _, in each case for the benefit of one or more Projects (collectively, *"Access Rights"*).

        b.      Upon the request of Lessee or a Sublessee at any time and from time to time during the term of this Lease, Lessor shall grant thereto (in recordable form and containing such terms and provisions as may reasonably be requested by Lessee or such Sublessee), for no additional consideration, the following stand-alone easements (each, a *"Separate Easement"*):

Exhibit C to Wind Energy Development and Option Agreement

(a) one or more nonexclusive easements for Access Rights on, over and across the Property, including for vehicular and pedestrian ingress, egress and access to and from one or more Projects; and (b) one or more easements for Wind Power Facilities on, under, over and across the Property, for the benefit of one or more Projects; in each such case as, where and to whom designated by Lessee or such Sublessee. The term of each Separate Easement shall run concurrently with the term of this Lease, and shall terminate upon the expiration or termination hereof. For purposes of this Lease, the term *"Project"* means one or more Generating Units and associated Wind Power Facilities that are constructed, installed and/or operated on the Property and/or on other lands in the general vicinity of the Property by or on behalf of Lessee, a Sublessee or an affiliate of either thereof, as an integrated energy generating and delivery system.

**Exclusivity**. Lessee shall have the exclusive right to develop and use the Property for wind energy purposes and to convert all of the wind resources of the Property; provided, however, that nothing expressly or impliedly contained in this Lease or represented to Lessor shall be construed as requiring Lessee to (a) undertake construction, installation or operation of any Wind Power Facilities on the Property or elsewhere, (b) continue operation of any Wind Power Facilities from time to time located on the Property or elsewhere or (c) generate or sell any minimum or maximized amount of electrical energy from the Property; and the decision if, when and to what extent to construct, install or operate Wind Power Facilities, or to generate or sell electrical energy, shall be solely in Lessee's discretion. Lessor shall cooperate with Lessee and each Sublessee in connection with its Operations, and, upon request by Lessee, shall make available to Lessee for inspection copies of all reports, agreements, surveys, plans and other records of Lessor that relate to the wind on or across the Property or to the feasibility of wind energy development on the Property.

**Term**. This Lease shall initially be for a term (the *"Primary Term"*) commencing on the Effective Date and ending thirty (30) years after the Effective Date.

**Extended Lease Term**. Lessee shall have the right and option (the *"Lease Extension Option"*) to extend the term of this Lease for one (1) four (4) year period (*"Extended Lease Term"*).

**Rent.**

    a.    For each Year, Lessee shall pay to Lessor, in rent (the "*Rent*"), an amount equal to Nine Thousand Five Hundred Dollars ($9,500) multiplied by the Lessor's Share, multiplied by the installed generating capacity as determined by the manufacturer's nameplate rating located on the Project Property from time to time. As used in this Lease "Lessor's Share" shall mean a fraction, the numerator of which is the number of acres comprising the Lessors' Property, and the denominator of which shall be the number of acres comprising the Project Property as of the date of the delivery of the Option Notice.

    b.    Rent shall be paid quarterly in arrears

**No Interference**. Neither Lessor's activities nor the exercise of any rights or interests heretofore or hereafter given or granted by Lessor to any Related Person (as defined below) of Lessor, whether exercised on the Property or elsewhere, shall, currently or prospectively, interfere with,

Exhibit C to Wind Energy Development and Option Agreement

impair or materially increase the cost of (a) the construction, installation, maintenance or operation of any Project, (b) vehicular or pedestrian access to, or the transmission of energy from, the Property, any Wind Power Facilities or any Project, (c) any Operations of Lessee or any Sublessee on the Property or with respect to any Project or (d) the undertaking of any other activities or the free enjoyment and exercise of any other rights or benefits given to or permitted Lessee hereunder.  Without limiting the generality of the foregoing, neither Lessor nor any Related Person of Lessor shall (i) interfere with or impair (A) the free, unobstructed and natural availability, accessibility, flow, frequency, speed or direction of air or wind over and across the Property (whether by planting trees, constructing buildings (except as provided in Section 2(e) of the Agreement) or other structures, or otherwise), or (B) the lateral or subjacent support for the Wind Power Facilities or (ii) engage in any other activity on the Property or elsewhere; in each case that might cause a decrease in the output or efficiency of Lessee's or any Sublessee's Generating Units.  As used herein, the term *"Related Person"* means any member, partner, principal, officer, director, shareholder, predecessor-in-interest, successor-in-interest, employee, agent, heir, representative, contractor, sublessee, grantee, licensee, invitee or permittee of a specified Party, or any other person or entity that has obtained or hereafter obtains rights or interests from such Party. Notwithstanding the foregoing, commencing on the Effective Date and during the Term, the Lessor has the right to construct certain six buildings on the Investments Property and access to the six buildings in the area identified on the map attached hereto marked <u>Exhibit B</u> are contemplated by Owner to be leased to third parties ("Building Leases") with prior approval by Lessee which approval shall not be unreasonably withheld <u>provided</u> that such building(s) shall be placed on the Investments Property and be placed so as to minimize impacts to the wind turbine layout and as long as the construction, operation and leasing of such buildings do not interfere with the construction or operations of the Wind Power Facilities or any Project. Lessor shall seek approval from Lessee prior to construction of the buildings and access thereto and Lessee shall not unreasonably withhold approval for Lessor to build such buildings and access thereto. The buildings shall not exceed a height of 50 feet above the ground level or exceed and area of 75,000 square feet of rooftop in the aggregate.

**<u>Right To Assign, Sublease and Encumber</u>.**  Lessee and each Sublessee shall have the absolute right at any time and from time to time, without obtaining Lessor's consent (but with written notice to Lessor that contains the contact information of the transferee), to: (a) assign, sublease or grant an easement, subeasement or license in, or otherwise transfer all or any portion of its right, title or interest under this Lease, in its Sublease and/or in any Wind Power Facilities to any person or entity (each, other than a transfer to or from a Lender, a *"Transfer"*); and/or (b) encumber, hypothecate, mortgage or pledge (including by mortgage, deed of trust or personal property security instrument) all or any portion of its right, title or interest under this Lease, in its Sublease and/or in any Wind Power Facilities to any Lender as security for the repayment of any indebtedness and/or the performance of any obligation. As used herein, (i) the term *"Sublessee"* means any person or entity that receives a Transfer from Lessee of less than all of the right, title or interest under this Lease or in one or more Easements, (ii) the term *"Sublease"* means the grant or assignment of such rights from Lessee to a Sublessee and (iii) the term *"Lender"* means any financial institution or other person or entity that from time to time provides secured financing for some or all of Lessee's or a Sublessee's Project, Wind Power Facilities or Operations, collectively with any security or collateral agent, indenture trustee, loan trustee or participating or syndicated lender involved in whole or in part in such financing, and their

Exhibit C to Wind Energy Development and Option Agreement

respective representatives, successors and assigns. References to Lessee in this Lease shall be deemed to include any person or entity that succeeds (whether by assignment or otherwise) to all of the then-Lessee's then-existing right, title and interest under this Lease.

**Lessee's Right To Terminate**. Subject to the last sentence of this Section , Lessee shall have the right, at any time and from time to time during the term of this Lease, to surrender or terminate all or any portion of its right, title and interest in this Lease or the Easements (as to all or any portion or portions of the Property), by giving Lessor thirty (30) days notice and by executing and causing to be acknowledged and recorded in the Official Records of the County, a quitclaim deed describing with particularity the portion of such right, title or interest so quitclaimed and the part of the Property to which it applies. Upon any such quitclaim by Lessee, the Parties' respective rights and obligations hereunder (including as to the Rent) shall cease as to the portion of the Property or the right, title or interest herein as to which such quitclaim applies, but the Lease, the Easements and the Parties' respective rights and obligations hereunder shall remain in full force and effect as to any right, title and interest of Lessee not so quitclaimed. Notwithstanding anything herein to the contrary, if (i) Lessee or an affiliate of Lessee constructs, installs and continues to operate a Project on lands adjacent to or in the general vicinity of the Property, (ii) each property parcel within such Project boundary is greater than fifty (50) acres and (iii) Lessee chose not to construct Generating Units for such Project on the Property, then Lessee shall not have the right to terminate this Lease.

**Indemnity**
Each Party (the "***Indemnifying Party***") shall defend, indemnify and hold harmless the other Party and such other Party's members, officers, agents, contractors, employees, subcontractors or invitees ("***Related Persons***") (each, an "***Indemnified Party***") from and against any and all claims, litigation, actions, proceedings, losses, damages, liabilities, obligations, costs and expenses, including attorneys', investigators' and consulting fees, court costs and litigation expenses (collectively, "***Claims***") suffered or incurred by such Indemnified Party, arising from (a) physical damage to the Indemnified Party's property (which (i) in Lessee's or any Sublessee's case, shall include damage to any improvements installed in accordance with this Lease and (ii) in Lessor's case, shall include damage to crops and livestock), to the extent caused by the Indemnifying Party or any Related Person thereof, (b) physical injuries or death to or of the Indemnified Party or the public, to the extent caused by the Indemnifying Party or any Related Person thereof, (c) any breach of any covenant, and any failure to be true of any representation or warranty, made by the Indemnifying Party under this Lease, (d) the presence or release of Hazardous Materials in, under, on or about the Property, which are or were brought or permitted to be brought onto the Property by the Indemnifying Party or any Related Person thereof or (e) the violation of any environmental Law by the Indemnifying Party or any Related Person thereof; provided, however, that in no event shall the Indemnifying Party be responsible for defending, indemnifying or holding harmless any Indemnified Party to the extent of any Claim caused by, arising from or contributed to by the negligence or willful misconduct of such Indemnified Party.

**Taxes.**

Lessee will pay increase in real property taxes, if any directly attributable to Lessee's improvements.

Exhibit C to Wind Energy Development and Option Agreement



## Maintenance of Wind Data.

Lessee has the obligation to maintain the Wind Data and Environmental Studies (each as defined in the Agreement) during the Primary Lease Term and any Extended Lease Term; provided that if Lessee submits written notice to Lessor designating Lessor as the party obligated to maintain the Wind Data and Environmental Studies, then, commencing on the date that is 90 days from the date of such notice, the Lessor shall be obligated to maintain the Wind Data and Environmental Studies until the expiration or earlier termination of the Lease.  In the event Lessee does not so designate Lessor as the party obligated to maintain the Wind Data and Environmental Studies, then upon the expiration of the Lease, each of Lessor and Lessee will be entitled to use the Wind Data and Environmental Studies.

## Assistance with Neighbor Disputes.

In the event a neighboring landowner or tenant (a "*Neighbor*") repowers or causes the repowering of any of its wind turbine generators and such repowering adversely affects the wind resources of the Property (a "*Repowering Event*"), then, upon the request by Lessee, Lessor agrees to assist Lessee with the resolution of any dispute with the Neighbor relating to the Repowering Event.

## Removal of Wind Power Facilities.

Lessee's interest in all Wind Power Facilities remaining on the Property on the date which is one hundred eighty (180) days after the expiration or earlier termination of the Term (the "*Transfer Date*") shall be vacated and surrendered by Lessee to Lessor.  Notwithstanding the foregoing, Lessor shall have the right to require Lessee to dismantle and remove the Wind Power Facilities, excluding any subsurface footings (except as required under the Kern County wind energy zoning ordinance) and piers, upon request therefor prior to the Transfer Date, but Lessee shall have no right or obligation to dismantle or remove the Wind Power Facilities as to any request received after the Transfer Date and shall have a period of no less than one hundred eighty (180) days to remove such Wind Power Facilities from the date of receipt of Lessor's request.  Any Wind Power Facilities left on the Property after the Transfer Date  will become the property of Lessor, and shall be considered conveyed to and accepted by Lessor "AS-IS, WHERE AS, AND WITH ALL FAULTS" and with no warranties of any kind whatsoever.

**Permits.** Lessor authorize Lessee to process and obtain any and all land use permits and/or changes including but not limited to the zone change, variance and conditional use permits in connection with the Project.  Further, Lessee shall have the right to meet with governmental agencies and with any other persons or entities with whom Lessor has contractual arrangements relating to, or which have jurisdiction over or an interest in, the Project Property or any portion thereof.

Exhibit C to Wind Energy Development and Option Agreement





**Exhibit A to Lease**

**Real Property Description.**

The **RLC Property** consist(s) of approximately 670 acres of land in Kern County, California as more specifically described below:

| Section 35, Township 12 North, Range 13 West |
|---|

PARCEL 1:
West Half, West Half, Southeast Quarter, Section 35, Township 12 North, Range 13 West, S.B.B. & M. ((Assessor's Parcel Number 22445025)

Excepting therefrom the North 249 feet thereof.

PARCEL 2:
South Half, West Half, East Half, Southwest Quarter, of fraction Section 35, Township 12 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 22445029)

Also excepting therefrom twenty-five percent (25%) of all oil, carbohydrates, minerals (metallic and non-metallic, boron, rate earth, rock, sand and gravel. Grantor herein shall not have the interest in proportion to above interest in the event oil, minerals, etc. are development as reserved by Earl W. Dible and Isable W. Dible, as community property in deed recorded January 13, 1969, in Book 4231 Page 301 of Official Records,

PARCEL 3:
South Half, North Half, Northwest Quarter, Southeast Quarter, Southeast Quarter, Section 35, Township 12 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 22445033)

Subject to all covenants, conditions, restrictions, reservations, rights, rights of way, and easements of record.

| Section 36, Township 12 North, Range 13 West |
|---|

PARCEL 4:
West Half, of Lots 1 and 2 in the Northwest Quarter, of Section 36, Township 12 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 22444001)

The plant of a dependent resurvey of said township was filed in the District Land Office, February 28, 1940. (Assessor's Parcel Number 22444001)

Exhibit C to Wind Energy Development and Option Agreement

PARCEL 5:
Lot 2 in the Northeast Quarter, of Section 36, Township 12 North, Range 13 West, S.B.B. & M.
(Assessor's Parcel Number 22444003)

Excepting therefrom one-half of all oil, gas, minerals and other hydrocarbon substances in and
under the land above described, as reserved by High F. Newman and December 10, 1975, in
Book 4927, Page 2373 Official Records.  The plat of a dependent resurvey of said Township was
filed in the District Land Office February 28th, 1940. (Assessor's Parcel Number 22444003)

PARCEL 6:
Lot 1 in the Northeast Quarter, of Section 36, Township 12 North, Range 13 West, S.B.B. & M.
(Assessor's Parcel Number 22444005)

Excepting therefrom the East Half, East Half, of said Lot 1 as conveyed to Frederick Carlson and
Sulma Lee Carlson, husband and wife as joint tenants, in deed recorded March 3, 1970 in Book
4373 Page 987 of Official Records.

Also excepting therefrom the West Half, West Half, of said Lot 1, as conveyed to Nicholas C.
Theodore and Pauline R. Theodore, husband and wife as joint tenants, in deed recorded June
27th, 1972 in Book 4892 page 551 of Official Records.

Also excepting therefrom one-half of all oil, gas, minerals and other hydrocarbon substances in
and under said land as reserved by Hugh F. Newman and Marion L. Newman, husband and wife.

PARCEL 7:
The North  Half, North  Half, Northwest Quarter, Southwest Quarter, Section 36, Township 12
North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 22444008)

| Section 02, Township 11 North, Range 13 West |
| --- |

PARCEL 8:
Lot 17, Section 2, Township 11. North, Range 13 West, S.B.B.M. Assessor's Parcel Number
(237 121 02)

Except such oil, gas and all other mineral deposits together with the rights to prospect for, mine,
and remove the same, as were required to be reserved to the United States by the act of June 1,
1938 (52 stat. 609) as amended and as reserved in the patent from the United States to Claire
Gleason recorded February 27, 1962 in book 3467 page 73 of official records.

PARCEL 9:
Lot 22 of Section 2, Township 11 North, Range 13 West, S.B.B. & M.

East Half, Southeast Quarter, Northwest Quarter, Northwest Quarter of Section 2, Township 11
North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 237-121-29)

Exhibit C to Wind Energy Development and Option Agreement



Excepting therefrom all oil, gas and other mineral deposits in the land so patented, together with the right to prospect for, mine and remove the same according to the provisions of said act of June 1, 1938 as excepted and reserved in patent by the united States of America recorded January 30, 1961 in Book 3343, page 995 of official records.

PARCEL 10:
Lot 36 of Section 2, Township 11 North, Range 13 West, S.B.B.M. Excepting therefrom all oil, gas and other mineral deposits in the land so patented, together with the right to prospect for, mine and remove the same.

According to the provisions of said act of June 1, 1938, as reserved by the United States of America, in patent recorded April 19, 1965 in Book 3832 page 729 of official records. Assessor's Parcel Number (237 122 14)

PARCEL 11:
Lot 51 in the North Half of Section 2, Township 11 North, Range 13 West, S.B.B. & M. (Assessor's Parcel Number 237-122-31)

Excepting therefrom to the United States all oil, gas and other mineral deposits in the land so patented, together with the right to prospect for, mine and remove the same according to the provisions of said act of June 1, 1938 as reserved by the United States of America in patent recorded January 30, 1961 in book 3343 page 995 of official records.

PARCEL 12:
The East Half, Northwest Quarter, Northwest Quarter, Southwest Quarter, of Section 2 Township 11 North, Range 13 West, S.B.B.M. Assessor's Parcel Number ( 237 131 02)

Excepting therefrom all oil, gas and other mineral Deposits in the Land so patented, together with the right to prospect for, mine and remove the same according to the provisions of said act of June 1, 1938, as reserved by the United States of America, in patent recorded February 8, 1960 in Book 3237, page 62 of official records.

PARCEL 13:
West Half, Southeast Quarter, Southeast Quarter, Southeast Quarter, Section 2 Township 11 North, Range 13 West, S.B.B.M. Assessor's Parcel Number (237 132 29)

Except the North 264 feet.

Also except all oil, gas and other mineral deposits in the lands so entered and patented, together with the right to prospect for, mine and remove the same pursuant to the provisions an limitations of the act of June 1, 1938  as reserved in the patent executed by the United States of America recorded January 16, 1961, in Book 3339 Page 85, of Official Records.

PARCEL 14:
East Half, Southwest Quarter, Southwest Quarter, Southeast Quarter, Section 2 Township 11 North, Range 13 West, S.B.B.M. Assessor's Parcel Number (237 132 34)

Exhibit C to Wind Energy Development and Option Agreement